[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On June 5, 2001, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Angel S., Sr., (hereinafter, "respondent"), the father of two brothers, Angel S. Jr., born January 1990, and Jose S., born March 1994.[1] These two boys have been in foster care for over 4 years.
The court finds there are no other proceedings pending in any other court affecting the boys' custody and that the court has jurisdiction to determine this matter.
Trial on the petitions was held on December 6, 2001. The respondent vigorously contested the petitions.
The petitions allege three statutory grounds for termination of the respondent's parental rights, abandonment, failure to rehabilitate and no ongoing parent-child relationship. General Statutes §§ 17a-112 (j)(3), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;" "(B)(i) the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, . . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child;" and "(D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional and educational needs of the child and to allow further time for the establishment of such CT Page 1297-j parent-child relationship would be detrimental to the best interest of the child."
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment. In this case, the petitions were last amended on December 6, 2001. In re Joshua Z., 26 Conn. App. 58,63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901 (1992); In re EdenF., 250 Conn. 674, 688, 741 A.2d 873 (1999). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both issues is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. Statev. Anonymous, 179 Conn. 155, 172-173, 425 A.2d 939 (1979); In re JuvenileAppeal (84-BC), 194 Conn. 252, 258, 479 A.2d 1204 (1984); In re NicolinaT., 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804,525 A.2d 519 (1987); In re Emmanuel M., 43 Conn. Sup. 108, 113,648 A.2d 904, cert. denied 231 Conn. 915, 648 A.2d 151 (1994).
For the reasons stated below, the court grants the petitions for termination of parental rights on the grounds of abandonment and failure to rehabilitate. The petitioner failed to prove the ground of no ongoing parent-child relationship by clear and convincing evidence.
 I FACTUAL FINDINGS
The credible and relevant evidence offered at trial, and a review of the judicially noticed court records,[2] supports the finding of the following facts:
A. Procedural Case History
On December 18, 1997, neglect and uncared for petitions and motions for temporary custody were filed by DCF on behalf of Angel Jr. and Jose, alleging that they were being permitted to live under conditions, circumstances or associations injurious to their well-being, that then 3 year old Jose had been physically abused, suffering facial bruises and a fractured arm, and that Angel Jr.'s home could not provide the specialized care which his physical, emotional or mental condition required. Ex parte orders of temporary custody was granted on the filing CT Page 1297-k date and the court issued preliminary steps indicating what would be expected of the parents if they sought to regain custody of the children. The respondent was served with a copy of the petitions, motions, accompanying affidavits and the preliminary specific steps. The temporary custody order was sustained after a preliminary hearing on December 26, 1997. The boys' mother, from whose physical custody the children had been removed, agreed to the sustaining of the temporary custody order. The respondent did not attend the preliminary hearing, although he did attend the subsequent plea hearing and was advised of his rights and appointed counsel. He did not seek to contest the temporary custody order.
The court adjudicated the two boys neglected and committed them to the custody of DCF on May 14, 1998.[3] The respondent did not attend court on the date of the initial commitment, but the court did issue a set of expectations, outlining what the respondent would need to do to work toward regaining custody of his sons.[4] Court hearings were held in November and December of 1998 to review the progress of the parents with respect to reunification. The respondent did not attend these hearings. On May 13, 1999, the court granted the first motions to extend the boys' commitments and found that efforts toward reunifying them with either parent were no longer appropriate. On August 20, 1999, DCF filed petitions to terminate the parental rights of both parents. The respondent appeared to enter a plea to these termination petitions on September 14, 1999 and was appointed counsel at the expense of the judicial branch.
On March 14, 2000, the court granted extensions of the commitments for a second time. At this hearing, the court ordered DCF to resume reunification efforts between the respondent and his sons. On October 31, 2000, the rights of the boys' mother were terminated by consent. The allegations as to the respondent contained in the August 20, 1999 termination petitions were withdrawn as DCF represented that the respondent was making progress.
On May 10, 2001, extensions of the commitments were granted for the third time. The respondent was not present at this hearing. The court, informed that little progress had been made by the respondent toward reunification, ordered DCF to file new petitions to terminate the respondent's parental rights. DCF filed these petitions on June 5, 2001.
B. Respondent Father, Angel S., Sr.
The respondent was born on May 11, 1962 in Puerto Rico. He is the oldest of three sons born to Ms. Eugenia M-S. His family moved to the United States when he was seven years old. The respondent attended all three of the high schools in Hartford, but dropped out of school in the CT Page 1297-l eleventh grade.
Between 1984 and 1994, the respondent fathered four children out of wedlock: Shammaly, Christina, Angel and Jose. The respondent's mother obtained custody of Angel through Probate Court when he was a year old and she subsequently sought custody of Jose when he was an infant. His mother cared for these boys until she died on June 20, 1997. After her death, the respondent tried to care for them, but DCF, acting on referrals alleging he was using and selling drugs and not properly supervising the children, intervened and placed the boys with Moraima G. The boys spent a few months in their mother's care but were removed from her home and placed in foster care in December of 1997 after the occurrence of suspected physical abuse to Jose.
The respondent has a criminal history for possession and sale of narcotics, larceny and failure to appear. Subsequent to the children's placement in foster care, he was convicted for possession of narcotics with intent to sell. He served fourteen months in the Allenwood federal prison from September 9, 1998 until sometime in August of 1999. Prior to his incarcerations, between late 1997 and September of 1998, he did not visit his sons or cooperate with DCF. Up until the end of 1999, the father's participation in reunification efforts was hampered by his incarceration; however, after his release, he returned to Hartford and contacted DCF about taking care of his sons. For a while, he claims he visited with Jose on a weekly basis. He would pick Jose up from his foster home and take him to his apartment for a part of the day. He also visited Angel at his group home. On at least one occasion, the group, home transported Angel to visit the respondent at location closer to Hartford. The respondent also attended administrative case review conferences and court hearings. He signed releases allowing DCF to communicate with his probation officer and his substance abuse counselor. On March 14, 2000, with DCF approval, the court ordered reunification efforts to resume with the respondent, reversing a prior finding that such efforts were no longer appropriate. In June, 2000, his substance abuse counselor, Stephanie Cohen, report that he had successfully completed a relapse prevention program and aftercare support groups. His urinalyses had been consistently negative prior to this report. DCF presented a glowing case status report as to the respondent's progress with reunification efforts on October 30, 2000.
In December, 2000, the respondent's progress grounded to a halt and his situation began going downhill. The respondent's girlfriend was using illegal drugs again and rather than leaving her, the respondent chose to stay with her for almost another year. He injured his back at work in March of 2001 and claims he was bedridden for about two months, but he also continued to earn some money tinkering with cars while he was CT Page 1297-m disabled. He claims he was ineligible for workers' compensation. He stopped contacting DCF in December 2000 and ceased his regular visitation. He did not contact the group home or Jose's foster mother on a regular basis, although he had the addresses and phone numbers. The respondent testified that he didn't want his children around his girlfriend, but his visits with Angel and Jose easily could have taken place in a different environment; in fact, Angel's visits were occurring at the Silver Fox home. The St. Francis parent aide assigned to the respondent, Milagros Barrios, informed Beatrice Velasquez, the DCF social worker, that in March of 2001, she had closed the respondent's case because he was not responding to letters she had sent him for appointments. He moved his residence and did not inform DCF of his whereabouts.
When Velasquez finally located the respondent, she called him at the end of April, 2001. She left a message, and he returned the call in May. When he called Velasquez, he inquired about visits, but gave no explanation as to why he had stopped. Velasquez told him they would need to meet regarding his future plans before visits were resumed. She didn't hear from the respondent again until he called on September 21, and they again discussed visits. During this call, he also told Velasquez that he was planning to move to Puerto Rico in about a month, and wanted to take Jose, whom he hadn't seen for almost a year. He hoped to send for Angel later. He said relatives would help him take care of the boys in Puerto Rico. DCF had concerns about this plan since the respondent had done nothing to explore special services to address either child's needs in Puerto Rico and they knew nothing about the relatives in Puerto Rico. Velasquez arranged an appointment to discuss these issues with the respondent at her office on September 24, but he didn't show up.
Velasquez also talked to Otto Rotti, the respondent's parole officer, in September of 2001, who told her that the respondent had fallen out of compliance with the conditions of his parole, one of which was outpatient drug treatment. A drug test in July 2001 had produced a positive result suspicious for the use of heroin. The parole officer had recommended inpatient substance abuse treatment for the respondent, but he was refusing to go. He had not kept Rotti informed of his whereabouts, and he was not responding to Rotti's letters. Eventually, Rotti convinced him to enter an inpatient drug rehabilitation program in October of 2001, just a few months ago. He was discharged to a halfway house, where he will remain until May of 2002. The respondent's last visit with Angel was in June of 2000. His last visit with Jose was in November, 2000. During the six months that elapsed between the filing date of the termination petitions and the date of trial, he made no effort to resume contact with his children. CT Page 1297-n
The respondent testified that he has been paying $150.00 per week as child support for Angel and Jose. A review of the support case, pending in the Family Support Magistrate Division for the Judicial District of Hartford, (Court Exhibit 1), of which this court took judicial notice, reveals that he first acknowledged paternity of Shammaly, Christina and Angel in July 1991, but described himself as unemployed and did not agree to pay any support. In November of 1993, the State of Connecticut department of social services filed a support action on behalf of Shammaly and Christina. A default judgment for their support entered on March 14, 1994 for $15.00 a week. He was also ordered to pay $2.00 a week on an arrearage owed the state in the amount of $4,380.00.
On May 2, 1995, the commissioner of the department of social services filed an action against the respondent to determine the paternity of Jose. This action was consolidated with the preexisting support matter. On June 13, 1995, the respondent appeared in court. A judgment of paternity as to Jose was entered, and support for Jose was consolidated into the order for Shammaly and Christine. The weekly amounts for current support and arrearage payments did not change. The arrearage was now $5,355.00. The math isn't difficult to do. He had paid nothing since the entry of the first support order on March 14, 1994.
In September of 1995, the order was modified to apply to all four children, and the state moved to intervene the paternal grandmother as an interested party. The respondent did not appear in court for the modification hearing. The magistrate increased the current support order to $128.00, $32.00 per week for each of the four children, and $5.00 on an arrearage which had grown to $5,500.00.
On December 21, 2000, an application for contempt was issued against the respondent for failure to pay support. The alleged arrearage was $37,368.00 as of December 15, 2000. On February 29, 2001, the respondent appeared in court in response to the contempt application and was granted a continuance. He was told to resume support payments and return to court on March 28, 2001 with pay stubs. He did not appear in court on March 28, and an issued capias remains outstanding for his arrest for failure to appear.
His claim that he's regularly been paying child support by wage execution appears to be an exaggeration.
The respondent's testimony at trial was long on excuses. He testified that he was unaware that DCF had taken custody of his children, but he appeared in court within one month of their removal. He claimed that he incurred a back injury in March of 2001, which contributed to his cessation of contact with the children, but he already had stopped CT Page 1297-o visiting them months prior to that. He blamed his girlfriend's recurrent substance abuse, but inexplicably chose to remain living with her because he was "practically homeless," even though it is usually not advisable that a recovering drug addict associate with someone who continues to use. He left his girlfriend in March of 2001, moved to a motel for about a month, and then settled in Vernon, which he explains prevented his attendance at the parenting classes. He also blamed the fact that he discovered his driver's license was suspended in September or October of 2000, which further impeded visits, although he didn't contact DCF to make any request for assistance in transportation. In fact, the last time he had seen Angel, the group home had transported Angel to a location convenient for the respondent. He claims that his positive test for opiates in July of 2001 was attributable to the medication he took for his back pain, although he was unclear as to the kind of medicine it was, and he agreed to go back into a 28 day rehabilitation in October of 2001 despite his easily proven assertion that his back medication skewed the test results.
In light of his current situation, confinement in a halfway home, he admitted he still isn't ready to parent his children. He continues to work at Town Fair Tire, six days a week from 8 A.M. to 5 P.M.
C. Angel S., Jr.
Angel Jr. was born on January 1990 in Hartford. He presently resides at the Silver Fox Group Home in Torrington, where he has lived since December of 1997. Angel was born premature at 28 weeks with a positive toxicology screen for cocaine and heroin. He weighed only one pound eight ounces at birth. His mother received no prenatal care. Angel is blind, due to oxygen deprivation at birth, mentally retarded and has fetal alcohol syndrome. He is severely developmentally delayed.
Angel lives with six children similar in age to him in his group home. He gets along very well with all of them as well as the staff. The staff reports he has made a lot of progress, moving from non-verbal to communicative abilities. He is a fifth grader in a special education program and is beginning to pronounce words and read Braille. Angel's first foster placement was in a medically fragile group home, where the specially trained foster parents found him too complex too handle. Angel does see his brother, Jose, about once a month. Angel only briefly interacts with Jose, because he prefers solitary pursuits, especially listening to the radio.
At one point, a staff member of the group home was interested in adopting Angel, but the employer considered this a conflict. Angel needs a lot of structure and the support provided by the group home staff which CT Page 1297-p includes his teachers. The staff and teachers believe Angel will continue to make progress if he can continue to reside there, where he is connected to the residents and staff and feels secure and confident enough to try new things.
D. Jose S.
Jose was born on March 1994 in Hartford. He too was premature at 34 weeks gestations and weighed four pounds 8 ounces at birth. Both Jose and his mother tested positive for cocaine and heroin at the time of delivery. His mother admitted to using cocaine, heroin, and alcohol during her pregnancy. She attended one prenatal visit. Jose suffered moderately severe drug withdrawal which necessitated medication in addition to supportive care after birth. He also developed viral pneumonia and remained hospitalized until April 18, 1994. Jose has been in two placements since he was removed from his mother after presenting with facial bruises and a broken arm, for which no reasonable explanation was given.
Jose also has fetal alcohol syndrome and currently functions at the developmental level of a 3 year old. He has asthma and is given albuterol on an as needed basis, and has been diagnosed with ventricular septal defect (VSD), which is a mild heart murmur. His VSD must be monitored by a cardiology clinic.
Jose just completed the first grade. His teachers report that although he is intellectually delayed, he has made great progress since he started school. Jose resides in the foster home of Maria R., with whom he has been placed since May 6, 1998. He is a well-behaved, happy child who gets along well with others. When he was removed from his mother, he was described as behaviorally difficult. He enjoys visiting his older brother, Angel, whom he calls "mi amigo."
DCF already has made efforts to find a home that will provide a more permanent resource for Angel and Jose, but their handicaps and developmental difficulties, as well as their legal status, have been an impediment to finding them adoptive homes.
 II ADJUDICATION
Each statutory basis set out in General Statutes § 17a-112 (j) is an independent ground for termination. In re Baby Girl B., 224 Conn. 263,618 A.2d 1 (1992). The petitioner is required to prove one or more of the grounds alleged as to each parent in its petition by clear and convincing CT Page 1297-q evidence.
A. Reasonable Efforts Finding
Unless a court has found in an earlier proceeding that efforts to reunify are no longer appropriate, DCF, in order to terminate parental rights, initially must show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. State. Sec. 17a-112 (j)(1). "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B.,50 Conn. App. 554, 566, 718 A.2d 997 (1998).
On December 18, 1997, at the time the temporary custody orders were issued, and on May 14, 1998, when first committing Angel Jr. and Jose to DCF's care and custody, this court issued specific steps and expectations for the respondent to follow in order to promote reunification. In order to safely regain the custody of his sons, the respondent would have to keep all appointments set by or with DCF and cooperate with DCF home visits, keep his whereabouts known to DCF and his attorney, participate in parenting, individual and family counseling, submit to a substance abuse assessment and follow recommendations regarding treatment, submit to random drug testing, sign releases to check on his progress in any programs or services, secure and maintain adequate housing and legal income, engage in no substance abuse, and have no involvement with the criminal justice system. In 1998, although the respondent appeared in court for the plea hearing on the neglect and uncared for petitions, he made little effort to work toward reunification and did not visit the boys. He was sentenced to federal prison in Pennsylvania in September 1998. There is no evidence as to what, if any, rehabilitative programs he may have participated in while in prison.
In March of 2000, DCF persuaded the court to resume promoting reunification between the boys and the respondent. The court reversed a prior ruling that reunification efforts with the respondent were no longer appropriate. Prior to that date, DCF continued to provide the boys with medical and foster care and arranged for visits to resume. DCF agreed to monitor the respondent's drug rehabilitation treatment that was a requirement of his parole and obtained releases to monitor his progress. DCF also referred parent aide services to the respondent. By the end of 2000, the respondent's cooperation faltered. He had not visited Angel since June 2000 and his last visit with Jose was in November 2000. He made little effort to call the boys or send them any cards, gifts or letters. DCF lost contact with him and learned that his parole officer was also having concerns about his cooperation. CT Page 1297-r
DCF's efforts were hindered by the respondent's lack of cooperation, his own voluntary criminal behavior, his voluntary non-compliance with his parole conditions, his poor choice of associates, and his failure to keep DCF advised of his whereabouts. He admits he had no real excuse for failing to maintain contact with his sons.
The court finds by clear and convincing evidence that DCF, to the extent possible, made reasonable efforts to reunify the respondent father with his sons, and that the respondent was unable and or unwilling to benefit from such efforts.
B. Abandonment — C.G.S. § 17a-112 (j)(A).
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child.
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M., 6 Conn. App. 194, 209,504 A.2d 533 (1986).
 "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993); In re Roshawn R., 51 Conn. App. 44, 53, 720 A.2d 1112 (1998).
It is indisputable that the respondent has fallen far short of the above standards for exhibiting interest, concern, responsibility, support or moral guidance. He abdicated fathering these two children, both with intense needs, to his mother until 1997. When he tried to take care of them, he was inhibited by his lack of parenting skills and his illegal behaviors. He didn't acknowledge paternity of Angel until he was over a year old, and he never voluntarily acknowledged Jose's paternity. He never agreed to pay support; support orders were imposed on him as default judgments. He has paid little support since orders were entered CT Page 1297-s and is alleged to be in contempt of those orders. Although incarcerated in September 1998, the boys were in foster care from December 1997, yet he exhibited little concern or cooperation. There is no evidence he made any effort to call or write the children while he was in federal prison.
The respondent's "efforts," such as they were, fail even to minimally fulfill any of the general obligations of parenthood. Even after the respondent became more involved subsequent to the filing of the first termination petitions, he failed to make significant and sustained progress toward fulfilling the recommended steps and expectations. He lost contact with his sons and DCF. He failed to comply with his parole conditions, and he cannot be considered a successfully rehabilitated substance abuser, having just been ordered back into inpatient care less than three months ago.
There is no evidence he has acquired a thorough understanding of the specialized care his sons would require, and he presented no viable plan at trial as to how or when he intended to assume their care. He stated he wants to relocate to Puerto Rico and take Jose with him perhaps sending for Angel Jr. at a later time. He had no knowledge of what kind of specialized programs might be available for his boys' special needs in Puerto Rico, and had not seemed to have made even a cursory investigation. He talked about having relatives in Puerto Rico to help him take care of the boys. In the past, the "help" of his relatives transformed into full time care while he continued to abdicate his responsibilities. Of course, the care taking abilities, or even willingness, of these unidentified relatives has never been assessed. He showed no understanding or concern as to the possible negative effects of suddenly wrenching the boys from their respective placements and educational programs, where they are progressing developmentally and have developed attachments.
"A parent's interest in his child must not merely be sporadic in nature, but must exist on a consistent and continuing basis." In re ShaneP., 58 Conn. App. 244, 256, 754 A.2d 109 (2000).
Statutory abandonment on the part of the respondent father has been proven by clear and convincing evidence. He has never manifested a consistent, prolonged and reasonable degree of interest, concern or responsibility as to his boys' welfare. In re Rayna M., 13 Conn. App. 23,37-38, 534 A.2d 897 (1987); In re Michael M., 29 Conn. App. 112,121-123, 614 A.2d 832 (1992).
C. Failure to Rehabilitate — C.G.S. § 17a-112 (j)(B).
This is the second ground for termination alleged against the CT Page 1297-t respondent father. If the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child, grounds for termination exist.
The evidence is clear and convincing that Angel Jr. and Jose were adjudicated, neglected and committed to DCF on May 14, 1998, almost four years ago.
Personal rehabilitation, as used in the statute, refers to the restoration of the parent to a constructive and useful role as a parent.In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989); In re Hector L.,53 Conn. App. 359, 366-67, 730 A.2d 106 (1999). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M.,19 Conn. App. 371, 377, 562 A.2d 566 (1989).
These petitions were filed on June 5, 2001. The evidence in this case is clear and convincing that the respondent, as of the date of the filing of the last amendments to the termination petitions on December 6, 2001, had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior to the adjudicatory date, which is also the date of trial, which would encourage the belief that within a reasonable period of time, considering the age and needs of his sons, he could assume a responsible position in their lives.
A parent's compliance with expectations or specific steps is a relevant and important consideration in reaching a rehabilitation finding. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than the parent was at the time of the commitment. In reShyliesh H., 56 Conn. App. 167, 179-180, 743 A.2d 165 (1999); In re SarahAnn K., 57 Conn. App. 441, 450, ___ A.2d ___ (2000). In assessing rehabilitation, "the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted) Id., 448.
On page 13 of this decision, the court reviews the nature of the CT Page 1297-u specific steps and expectations that were issued for the respondent father. The attempts DCF made to advise the respondent what would be expected of him in order to have his sons placed back in his care, DCF's efforts to provide services, and the lack of the respondent's compliance are thoroughly detailed on pages 5 through 10.
The evidence is clear and convincing that the respondent has not achieved a status where he is more able to parent Angel Jr. and Jose than he was at the time of their initial commitments. In fact, given his parole status and confinement at a halfway home, he is in a worse position now than he was at the end of 1999. He testified that he is still not ready to care for them and he has formulated no viable plan. He still demonstrates no understanding of his sons' special problems or needs, and he failed to cooperate with the parent aide he was offered, who would have promoted his knowledge and enhanced his skills. Further, there is no evidence to conclude that rehabilitation into the role of a constructive parent could be achieved within a reasonable period of time. He has never been a constructive parent to any of his four children. This is a man with whom efforts would have to start from scratch, for the third time.
Further delay for a rehabilitation of the respondent, when he has already been given two chances to learn to parent his sons, with no prediction for success, will render the boys less capable of forming new attachments to an adoptive family and less adoptable than they are now. After nearly four years of foster care, they still require a high degree of care. Their foster placements are addressing their needs ably, and the boys are progressing developmentally. They are well adjusted in their educational programs. Even if adoptive homes are not found, they may be able to remain where they are, in situations where they feel secure, loved and comfortable. Why should the respondent continue to cause a degree of unsettlement? If these two boys didn't have mental disabilities, they would undoubtedly be exhibiting the effect of the confusion, hurt and disappointment a wholly disinterested parent can cause in a child. Any further deference to his biological status is totally unjustified given the low level of his commitment to his sons. Their present placements cannot offer them adoptive homes, but they need to be legally freed so a diligent search can continue. At the very least, a continuation of the requisite level of care and attention they require will be more guaranteed. The court also wants to insure that DCF is never tempted, for budgetary reasons, to agree to the removal of these boys from costly placements where they are doing well and return them to their wholly incapable father, consigning them to a chaotic and uncertain future in another jurisdiction.
D. No Ongoing Parent-Child Relationship — C.G.S. §17a-112 (j)(3)(D)
CT Page 1297-v
It would seem from the plain meaning of the statutory language of this ground that the respondent father clearly has not met the day-to-day parenting capability that the statute appears to require. However, case analysis and interpretation of this ground as it applied to non-custodial parents has crafted somewhat different criteria to determine whether or not there is no ongoing parent-child relationship. In order to prove this ground, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In re John G., 53 Conn. App. 12, 22,740 A.2d 496 (1999). In this case, DCF hasn't satisfied the first prong. Very little evidence was introduced as to the dates, length or quality of the visits that did occur between 1999 and 2000. The relationship, if any, the children may have had with their father during the time they resided with their paternal grandmother was never explored. The social worker, the only witness for DCF, related that she had never observed any of the father's visits, and admitted she could not gage how the children feel about their father.[5] There was no request for a parent-child interactional evaluation. Although an evaluation may not be required to prove this ground, in this case, expert opinion might have been very informative.
No ongoing parent-child relationship contemplates a situation in which, regardless of fault, a child either has never known his or her parent, or that no relationship has ever developed between them, or that the child has lost that relationship so that despite its former existence it has now been completely displaced. In re John G., supra,53 Conn. App. 22. The ultimate question is whether the child has no present memories or positive feelings for the natural parent. In reJessica M., 217 Conn. 459, 468, 586 A.2d 597 (1991); In re Shane P., supra, 58 Conn. App. 234; In re Alexander C., 67 Conn. App. 417, 422, ___ A.2d ___ (2001).
On the basis of the meager evidence produced by DCF in support of its ground, the court cannot find its existence by clear and convincing evidence.
 III DISPOSITION
1. Section 17a-112 (k) Criteria
The court has found by clear and convincing evidence that two of the CT Page 1297-w statutory grounds alleged by the petitioner for the termination of parental rights have been proven.
Before making a decision whether or not to terminate the respondent's parental rights, the court must also consider and make findings on each of the seven criteria set forth in Sec. 17a-112 (k). In re Romance M.,229 Conn. 345, 355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
DCF offered timely and appropriate services, to the extent possible, to facilitate a relationship. The nature and extent of DCF efforts to engage the respondent has been more fully discussed at pages 6 through 8 of this decision. DCF's efforts were thwarted by the respondent's lack of interest and cooperation and his penal confinements, which occurred subsequently to DCF's involvement with the family.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, DCF made reasonable efforts, to the extent possible, to reunify the respondent with Angel Jr. and Jose. The respondent was unwilling or unable to benefit from any services.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Preliminary steps and expectations were issued by the court for the respondent at the time the court first ordered temporary custody and again when it committed the boys to DCF's care and custody on May 14, 1998. On the day these were issued, the respondent was not present in court, but on subsequent dates, he did appear and was appointed counsel. The respondent's compliance with these steps and expectations was minimal and of insufficient duration to accomplish reunification.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties." CT Page 1297-x
The federal Adoption Assistance and Child Welfare Act of 1980,42 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In reSamantha B., 45 Conn. Sup. 468, 479, 721 A.2d 1255 (1998). Foster care should be a strictly limited episode in the life of a child. Angel Jr. and Jose, after over four years, are still in need of a permanent home, and there is no reason their almost wholly absent biological father, who was allowed an inordinate amount of time to resume full time parenting, should impose any further impediment to the process of finding them one. Both boys have been in their current placements for years. They are secure and comfortable there and are making progress in learned behaviors. Angel is close to his group home staff and fellow residents. Jose calls his foster mother, "Mommy."
(5) "The age of the child."
Jose, born on March 1994, is nearly 8.
Angel Jr., born on January 1990, is 12.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child."
The respondent made no continuous or sustained effort to adjust his circumstances, conduct or conditions to make it in the best interest of Angel Jr. and Jose to be placed in his custody in the foreseeable future. His own criminal conduct is one of the major impediments to his ability to parent. His parole officer had recent concerns sufficient to require his return to a drug rehabilitation program and halfway house until May of 2002. The respondent failed to maintain regular contact with his children, DCF or the foster home. He has not contributed, on a regular or consistent basis, any gifts or money toward his sons' support. He did not regularly call them or send them any cards or letters. In rendering this decision on the grounds alleged for termination, this court found that the derelict conduct of the respondent constituted statutory abandonment of his sons.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other CT Page 1297-y parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that indicates that DCF or any other person interfered with the respondent's ability to maintain a relationship with his sons by unreasonable acts or conduct. In fact, DCF and the court, contrary to statutory mandates,[6] bent over backwards to promote reunification. The first petition for termination of the respondent's parental rights was withdrawn to give him a second chance. It was the respondent's own poor judgment and criminal involvement that first interfered with reunification efforts, followed by his disinterest and lack of follow through. There is no evidence that economic circumstances have constituted a significant factor in the respondent's failure to maintain a meaningful relationship with the boys. He was provided with counsel at state expense and offered visits and services by DCF at little or no cost.
2. Best Interests of the Children
The court must now address the issue of whether the termination of parental rights is in the best interests of the child. This is the dispositional phase of a termination proceeding. In re Hector L., supra,53 Conn. App. 364, 730 A.2d 106 (1999); In re Alexander C., supra,67 Conn. App. 421.
With a statutorily? mandated twelve month limit prior to the institution of a permanency plan, a period of over four years is entirely unacceptable. The boys' lack of permanency and the effects of that uncertainty no longer can be tolerated. They are growing old enough and progressing well enough to be cognizant of their attachments to their caretakers and to be greatly affected by them. Finding these special needs children a permanent home will prove only more difficult if they are allowed to stay in a legal limbo. Their best interests will be served by expediting the process of finding them permanent placements that can provide them with the love and specialized care they require. Nothing presented at trial gave this court any indication the respondent even understands the extent and complexity of his children's needs. The court suspects he minimizes them rather than facing up to the full scope of the responsibility parenting them would involve.
The respondent's history with these boys shows they have never been a priority with him. Unfortunately, some argue that since the boys may be difficult to adopt, we should keep revisiting this man as a potential resource. Enough is enough. If the court was convinced this was truly a caring, loving father, capable of making the considerable effort and sacrifice it takes to parent these boys, it might be persuaded. One CT Page 1297-z wonders, what, if any, kind of support or guidance he has provided the two daughters who remain with their mother?
Based upon the foregoing findings, and having considered all the exhibits and testimony, the court concludes that the evidence is clear and convincing that the best interests of Angel Jr. and Jose are served by the termination of the respondent's parental rights so they may be free for adoption, or at the very least, a permanent, long term placement that addresses their special needs.
 IV CONCLUSION
The petition is granted and judgment may enter terminating Angel S. Sr.'s parental rights in Angel S. Jr. and Jose S. The commissioner of DCF is hereby appointed statutory parent so that the boys can be placed for adoption. In securing an adoption, the court urges DCF to pursue all possible routes, including photo registries.
Pursuant to General Statutes Sec. 17a-112 (o), the statutory parent will file a written report with the court on or before February 28, 2002 at 9:00 A.M. on plans for Angel Jr. and Jose. Additional plans will be filed in accordance with state and federal law at least every three months until such time as adoptions may be finalized. Written motions for a hearing to review the boys' plans must be filed with the court on or before December 26, 2002 at 9:00 A.M.[7]
KELLER, J.